```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
H&H ACQUISITION CORPORATION,              :
individually and on behalf of             :
FINANCIAL INTRANET, INC.,                 :
                                          :
                  Plaintiff,              :
                                          :
FINANCIAL INTRANET HOLDINGS,              :
FINANCIAL INTRANET, INC., BEN B. STEIN,   : 98 Civ. 5269(BSJ)(HBP)
INTERWEST TRANSFER COMPANY,               :
STEVEN A. SANDERS, MICHAEL SHEPPARD,      :    OPINION AND ORDER
MAURA MARX, HENRY SCHWARTZ,               :
LEONARD GOTSHALK, GOTSHALK ENTERPRISES,   :
LAW OFFICE OF STEVEN A. SANDERS, P.C.,    :
and BECKMAN, MILLMAN & SANDERS, L.L.P.,   :
                                          :
                  Defendants.             :
----------------------------------------x
```

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

On July 23, 1998 Plaintiff H&H Acquisition Corporation

("Plaintiff" or "H&H") filed a complaint (the "Complaint")

alleging claims arising out of a 1997 stock transaction between

Plaintiff and Ben B. Stein ("Stein").  Before the Court is

Defendants Steven A. Sanders ("Defendant Sanders"), Law Office

of Steven A. Sanders ("Defendant Law Office"), and Beckman,

Millman & Sanders, LLP's ("Defendant BMS") (collectively,

"Defendants") Motion for Summary Judgment pursuant to Rule 56 of

the Federal Rules of Civil Procedure, or, in the alternative,

for Judgment on the Pleadings pursuant to Rule 12(c).[1]  Plaintiff

---

[1]      The Complaint names twelve defendants, but the Motion currently before
the Court relates only to those claims against Defendants Sanders, Law
Office, and BMS.  Accordingly, the Court limits its opinion to
consideration of those claims.  Claims against Defendants Henry A.

has not opposed the Motion.  For the reasons set forth below,

Defendants' Motion is GRANTED in its entirety.

## BACKGROUND

## I.    Facts[2]

This case arises out of Plaintiff's 1997 sale of Financial

Intranet, Inc. ("FNTN") stock to Stein and Stein's and Financial

Intranet Holdings' ("Holdings") alleged subsequent defrauding of

Plaintiff in connection with that sale.  Plaintiff alleges that

Defendant Sanders (1) aided and abetted Holdings in defrauding

Plaintiff; (2) intentionally misrepresented certain facts upon

which Plaintiff relied in agreeing to sell stock to Holdings;

(3) negligently released stock to Holdings without first

ensuring that Plaintiff had received consideration for the

shares in question; (4) breached his fiduciary and contractual

duty to Plaintiff; (5) defrauded Plaintiff; and (6) converted

property belonging to Plaintiff.  Plaintiff also alleges that

Defendant Sanders is a "controlling person" of Holdings and thus

liable for Holdings' alleged violation of Section 10(b) of the

---

Schwartz and Interwest Transfer Company were dismissed in their
entirety on November 6, 1998 and June 19, 2001, respectively.  Claims
against Defendants Financial Intranet, Inc., Michael Sheppard, and
Maura Marx were dismissed in their entirety on October 20, 2009.

[2]     The facts stated here are drawn from Defendants' Local Rule 56.1
statement and from Plaintiff's Complaint.  Because Plaintiff has not
disputed Defendants' statement of facts, those facts are "deemed to be
admitted for purposes of the motion."  S.D.N.Y. Local Civil Rule
56.1(c); see also Giannullo v. City of New York, 322 F.3d 139, 140 (2d
Cir. 2003) ("If the opposing party . . . fails to controvert a fact so
set forth in the moving party's Rule 56.1 statement, that fact will be
deemed admitted.").

Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), Rule 10b-5 (17 C.F.R. 240.10b-5). Plaintiff further alleges that Defendant Sanders was a named partner of Defendants Law Office and BMS during the time period relevant to the Complaint, and thus that Defendants Law Office and BMS are vicariously liable for the allegedly wrongful actions of Defendant Sanders.

In September 1996, Plaintiff purchased approximately 3,660,000 shares, or ninety-nine percent, of Wee Wees, Inc., a Nevada corporation. (Movants' Rule 56.1 Stmt. ¶ 1.) In December 1996, the company's name was changed to Financial Intranet, Inc. (Id. ¶ 3.)

In March 1997, Plaintiff agreed to sell all but 400,000 of its shares in FNTN to Holdings, an entity controlled by Stein. (Movants' Rule 56.1 Stmt. ¶¶ 4,5,6.) As part of the transaction, Defendant Sanders served as escrow agent. (Id. ¶ 7.)

Under the terms of an escrow agreement dated April 3, 1997 (the "Escrow Agreement"), Defendant Sanders was to receive the shares to be escrowed from the transfer agent, Interwest Transfer Company ("Interwest"). (Movants' Rule 56.1 Stmt. ¶ 8.) Within five days of this transaction, Holdings was to deliver an irrevocable stock power, executed in blank, to cover the escrowed shares. (Id.) Once Defendant Sanders received word

3

that the stock had been fully paid for, he was authorized to release the shares to Holdings. (Id. ¶ 10.)

In mid-April 1997, Interwest distributed stock certificates representing 2,207,100 shares of FNTN stock to Defendant Sanders to be held in escrow. (Movants' Rule 56.1 Stmt. ¶ 11.) On or about April 25, 1997, Stein informed Defendant Sanders that he had paid for 551,775 shares of the FNTN stock held in escrow by Defendant Sanders and demanded that the shares be released to Holdings. (Id. ¶ 12.) Without confirming that Plaintiff had received proper compensation for the 551,775 shares, Defendant Sanders released the shares to Holdings. (Id. ¶ 13.)

On or about May 8, 1997, Plaintiff notified Defendant Sanders that Plaintiff had not received payment for the 551,775 shares that Defendant Sanders released. (Movants' Rule 56.1 Stmt. ¶ 16.)

On July 24, 1997, Defendant Sanders wrote to Interwest and requested that Interwest remove the stop order on all remaining FNTN stock registered in the name of Holdings, (Compl. ¶ 154,) allowing Holdings to sell the shares at will, (id. ¶ 213.) Plaintiff then demanded that Defendant Sanders withdraw the "lifting order." (Id. ¶ 156.) Defendant Sanders subsequently rescinded the instructions. (Movants' Rule 56.1 Stmt. ¶ 37; Compl. ¶ 213.) Although it would have been possible for Holdings to sell the FNTN shares at will during the time the

4

lifting order was in place, (Compl. ¶ 213,) Holdings never sold or transferred the FNTN shares "freed" under the order to anyone but Plaintiff, (Movants' Rule 56.1 Stmt. ¶ 38.)

On October 1, 1997, Defendant Sanders and Plaintiff entered into a letter agreement (the "Settlement Agreement") with the intention of resolving any controversy stemming from Defendant Sanders' breach of the Escrow Agreement. (Movants' Rule 56.1 Stmt. ¶ 18.) Under the terms of the Settlement Agreement, Defendant Sanders was to reimburse Plaintiff for the escrow fee of $2,500, instruct Interwest to put a stop order on the prematurely-released shares, and use his best efforts to locate the 551,775 shares in question. (Id. ¶ 19.) After Defendant Sanders sent Plaintiff $2,500 and contacted Interwest regarding the stop order, Plaintiff was to execute a general release in favor of Defendants. (Id. ¶ 20.)

In accordance with the Settlement Agreement, Defendant Sanders paid Plaintiff $2,500 in two equal payments. (Movants' Rule 56.1 Stmt ¶ 21.) Plaintiff accepted these payments. (Id. ¶ 22.) Defendant Sanders also sent a letter to Interwest on or about October 7, 1997 instructing the transfer company to put a stop order on the prematurely released shares. (Id. ¶ 23.) Defendant Sanders provided Plaintiff with a copy of this letter. (Id.) However, Plaintiff did not provide any of Defendants with a general release. (Id. ¶ 24.)

On January 23, 1998, Plaintiff wrote to Stein and indicated that Holdings had returned to Plaintiff the 551,775 shares of FNTN stock that Defendant Sanders prematurely released. (Movants' Rule 56.1 Stmt. ¶ 32.)  Plaintiff also informed Stein that Plaintiff had not received the medallion-guaranteed stock power associated with these shares, without which Interwest would not honor Plaintiff's right to the shares.  (Id. ¶¶ 31, 32.)

On January 29, 1998, Plaintiff requested that Defendant Sanders issue an opinion letter to Interwest regarding the ownership and negotiability of 1,000,000 shares of FNTN stock in Plaintiff's possession.  (Movants' Rule 56.1 Stmt. ¶ 33.)  On February 18, 1998, Sanders wrote back to Plaintiff and stated that he was unable to issue the requested opinion letter due to the fact that Plaintiff and Stein had adverse claims upon the stock.  (Id. ¶ 34.)

On July 23, 1998, Plaintiff filed the instant action in the United States District Court for the Southern District of New York alleging violations of Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), Rule 10b-5 (17 C.F.R. 240.10b-5), New York common law, Chapter 78 of the Nevada Revised Statutes, Florida common law, the Maryland Uniform Commercial Code, and Maryland common law.  Defendants now move for summary judgment on Counts 2, 3, 4, 5, 6, 7, and 8.

6

## II.  Procedural History

Plaintiff filed the Complaint on July 23, 1998.  The current Motion dates from 2008, when the Court, by Order dated July 31, 2008, directed Defendants to file briefing on any potentially dispositive issues on or before September 5, 2008.  The Court further instructed Plaintiff to file its opposition on or before September 26, 2008, and Defendants to make any reply submissions on or before October 3, 2008.

On September 3, 2008, Defendants requested an extension of time in which to file dispositive motions.  By Order dated September 4, 2008, the Court granted this application.

On October 3, 2008, Plaintiff requested an extension of time to respond to both the instant Motion and an additional motion for summary judgment filed by Defendants Michael Sheppard, Maura Marx, and FNTN. ("Technest-related Defendants").  By Order dated October 5, 2009, the Court extended the deadline for Plaintiff's opposition to October 27, 2008, reasoning that "the Court had not appreciated that it had staggered the dates for plaintiff's submissions in opposition to the Technest-related and Sanders-related defendants' respective motions for summary judgment."  The Court also notified Plaintiff that no further extensions would be granted.

On October 27, 2008 and again on October 28, 2008, Plaintiff requested yet another extension of time to respond to

7

the instant Motion. Defendants vehemently opposed that request. (See Defs. Letter, Oct. 27, 2008.)

By Order dated October 30, 2008, the Court rejected Plaintiff's request for an extension, noting that "[t]hree full days have passed since Plaintiff's deadline, and Plaintiff has yet to submit its opposition; this failure is 'but one more in a long string of examples of plaintiff's lack of diligence in prosecuting this case.'" (Order, Oct. 30, 2008 (quoting Order, May 31, 2006).) The Court also informed Plaintiff that it would decide Defendants' Motion unopposed.

## LEGAL STANDARD

A court shall grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995).

If a non-moving party fails to oppose a summary judgment motion, "summary judgment, if appropriate, shall be entered against" it. Fed. R. Civ. P. 56(e). The Second Circuit "has

made clear, however, that where the non-moving party chooses the
perilous path of failing to submit a response to a summary
judgment motion, the district court may not grant the motion
without first examining the moving party's submission to
determine if it has met its burden of demonstrating that no
material issue of fact remains for trial." Vermont Teddy Bear
Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)
(citation and quotations omitted). If the evidence submitted in
support of the summary judgment motion does not meet the
movant's burden of production, then "summary judgment must be
denied even if no opposing evidentiary matter is presented."
Id. at 244.

To that end, Plaintiff's failure to oppose Defendants'
Motion does not in itself justify the granting of summary
judgment. Courts have, however, granted unopposed motions for
summary judgment "so long as [movants] have met their threshold
burden of production." Washington v. City of New York, No. 05
Civ. 8884, 2009 WL 1585947, at *16 (S.D.N.Y. June 5, 2009).

"The test for evaluating a 12(c) motion is the same as that
applicable to a motion to dismiss under Fed. R. Civ. Proc.
12(b)(6)." Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638,
644 (2nd Cir. 1998). Thus, the Court must "accept all factual
allegations in the complaint as true and draw all reasonable
inferences in [Plaintiff's] favor." Johnson v. Rowley, 569 F.3d

9

40, 44 (2d Cir. 2009). To survive the 12(c) motion, in turn,

Plaintiff's complaint "must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible

on its face.'" Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937,

1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,

570 (2007)).

As with a Rule 12(b)(6) motion, Rule 12(c) motions are

limited to the facts alleged in the complaint. However, in the

course of its review, the Court may refer "to documents attached

to the complaint as an exhibit or incorporated in it by

reference, to matters of which judicial notice may be taken, or

to documents either in plaintiffs' possession or of which

plaintiffs had knowledge and relied on in bringing suit." Brass

v. Am. Film Tech., Inc., 987 F.2d 142, 150 (2nd Cir. 1993)

(citation omitted); see also Hayes v. Coughlin, No. 87 Civ.

7401, 1991 WL 220963, at *1 (S.D.N.Y. Oct. 16, 1991) ("Papers

outside a complaint may be incorporated by reference into the

complaint when such papers are referred to within the body of

the complaint.").

## DISCUSSION

Plaintiff alleges a variety of claims stemming from

Defendant Sanders' breach of the Escrow Agreement, including

(1) aiding and abetting fraud; (2) fraudulent misrepresentation;

(3) fraudulent concealment; (3) intentional misrepresentation of

10

certain facts upon which Plaintiff relied to his detriment; (4) negligence; (5) breach of fiduciary duty; (6) breach of contract; and (7) conversion. Plaintiff claims that Defendant Sanders is a control person of Holdings under the meaning of the 1934 Act, 15 U.S.C. § 78j(b), and thus liable for Holdings' alleged violations of that statute. Plaintiff further alleges that Defendants Law Office and BMS are vicariously liable for the alleged wrongdoing of Defendant Sanders.

The Court finds all of Plaintiff's claims to be without merit and thus GRANTS summary judgment in favor of Defendants on counts 2, 3, 4, 5, 7, 8, and part of count 6 and judgment on the pleadings in favor of Defendants on the second and final cause of action in count 6.[3]

---

[3] The Second Circuit has held that represented non-moving parties are entitled to specific notice of a district court's intention to treat a motion to dismiss as a summary judgment motion, even when the motion is styled as "in the alternative, for summary judgment." Nat'l Ass'n of Pharm Mfrs., Inc. v. Ayerst Labs., 850 F.2d 904, 911-12 (2d Cir. 1988). However, "[c]ompliance with these requirements . . . is not an end in itself." Sahu v. Union Carbide Corp., 548 F.3d 59, 67 (2d Cir. 2008) (internal quotation omitted). Rather, "[t]he essential inquiry is whether the [non-movant] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." Id. (internal quotation omitted).

In the instant case, Plaintiff had ample notice that the Court would consider Defendants' Motion as one for summary judgment. Defendants' Motion is styled as one for summary judgment, or, in the alternative, for judgment on the pleadings. (See Defs. Mot. Summ. J. 1.) In Orders dated October 5, 2008 and October 30, 2008, the Court referred to Defendants' Motion as one for summary judgment. (See Order, Oct. 5, 2008 (discussing the "Sanders-related defendants' . . . motion[] for summary judgment"); Order, Oct. 30, 2008 (stating that "Defendants have moved for summary judgment" and informing Plaintiff that the Court would decide the Motion unopposed).). In a letter dated October 28,

I.   Plaintiff Is Barred from Bringing Claims Against Defendant
Sanders Stemming from Defendant Sanders' Breach of the Escrow

Agreement

Plaintiff alleges (1) that Defendant Sanders is liable for
breach of contract, conversion, and the aiding and abetting of
fraud based on his premature release of FNTN stock to Holdings
and his attempt to lift the "stop order"; (2) that Defendant
Sanders fraudulently misrepresented his intention to comply with
the terms of the Escrow Agreement; (3) that Defendant Sanders
fraudulently concealed his premature release of the FNTN shares;
and (4) that Defendant Sanders intentionally misrepresented
certain facts upon which Plaintiff relied in selling FNTN stock
to Holdings and in entering into the Escrow Agreement.

Defendants, in turn, argue that all of the above claims
stemming from Defendant Sanders' admitted breach of the Escrow
Agreement are barred by the valid Settlement Agreement between
Plaintiff and Defendant Sanders.   The Court agrees.

1.   New York Law Favors Settlement Agreements

2008, Plaintiff's counsel referred to the pending Motion as one for
summary judgment.  (See Pl. Letter, Oct. 28, 2008.)  These
communications demonstrate that Plaintiff was on notice that
Defendants' Motion would be considered as one for summary judgment and
that Plaintiff had a full opportunity to respond to any facts alleged
by Defendants in their Motion.

As many courts have noted, "[s]ettlement agreements are

strongly favored in New York and may not be lightly cast aside."[4]

Willgerodt v. Hohri, 953 F. Supp. 557, 560 (S.D.N.Y. 1997); see

also Janneh v. GAF Corp., 887 F.2d 432, 436 (2d Cir. 1989) ("A

settlement is a contract, and once entered into is binding and

conclusive."), abrogated on other grounds, Digital Equip. Corp.

v. Desktop Direct, Inc., 511 U.S. 863 (1994). Accordingly,

afterthought or change of mind are not sufficient to justify

rejecting a settlement. See Rivera v. State, 496 N.Y.S.2d 230,

231 (N.Y. App. Div. 1985); see also Powell v. Omnicom, 497 F.3d

---

[4]     The Settlement Agreement does not specify a governing law. (See
Sanders Aff. Ex. B ("Settlement Agreement").) Therefore, this Court
must apply New York choice of law rules to determine what state law
governs the Settlement Agreement. See, e.g., Beth Israel Med. Ctr. v.
Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 582 (2d
Cir. 2006). New York courts apply the "center of gravity" or "grouping
of contacts" analysis in contract cases. See In re Allstate Ins. Co.,
613 N.E.2d 936, 939 (N.Y. 1993) ("The 'center of gravity' or 'grouping
of contacts' choice of law theory applied in contract cases enables the
court to identify which law to apply."). The factors considered in
this analysis include "the place of contracting, negotiation and
performance; the location of the subject matter of the contract; and
the domicile of the contracting parties." Id.

Considering these factors, the Court finds that New York is the center
of gravity of the Settlement Agreement. Since Defendant Sanders
transmitted his acceptance from New York, the contract was formed in
New York. See, e.g., TSR Silicon Resources, Inc. v. Broadway Com
Corp., No. 06 Civ. 9419, 2007 WL 4457770, at *3 n.3 (S.D.N.Y. Dec. 14,
2007) ("Since [Defendant] transmitted its acceptance from California,
the contract was formed in that state."); Ingram Micro, Inc. v. Airoute
Cargo Express, Inc., 154 F. Supp. 2d 834, 841 (S.D.N.Y. 2001) ("The
place of contracting will be that place where the acceptor
communicates, or otherwise transmits its acceptance." (internal
quotation omitted)). Moreover, the subject matter of the contract—the
actions required of Defendants so that Plaintiff would release them
from liability—was located in New York, and Defendants performed their
part of the contract in New York. Defendants are also domiciled in New
York. See, e.g., Lazard Freres & Co. v. Protective Life Ins. Co., 108
F.3d 1531, 1539 (2d Cir. 1997) ("[P]laces of contracting and
performance, are given the heaviest weight in this [choice of law]
analysis.").

124, 128 (2d Cir. 2007) ("When a party makes a deliberate, strategic choice to settle, a court cannot relieve him of that choice simply because his assessment of the consequences was incorrect."). Rather, a court may relieve a party of the consequences of a settlement agreement "[o]nly where there is cause sufficient to invalidate a contract, such as fraud, collusion, mistake or accident." Rivera, 496 N.Y.S.2d at 231.

Under New York law, "a party will be bound to an agreement if its actions, gauged by an objective standard, support the conclusion that it accepted the agreement." Mgmt. Recruiters of Boulder v. Nat'l Econ. Research Assocs., Inc., No. 02 Civ. 3507, 2006 WL 2109478, at *4 (S.D.N.Y. July 24, 2006); see also Pollitz v. Wabash R. Co., 100 N.E. 721, 725 (N.Y. 1912) (finding plaintiff estopped from denying the validity of a transaction "when the conduct of a plaintiff, relating to the transaction or matter complained of by him, subsequent to the rise of it, justifies and supports the normal and reasonable conclusion that he, by his assent thereto or acquiescence therein, has accepted and adopted it"). Perhaps the strongest indication that a party has assented to a contract is when that party accepts the benefits of the agreement without reservation. See Palumbo v. Norstar Bank Upstate N.Y., 622 N.Y.S.2d 263, 263-64 (N.Y. App. Div. 1995) (holding that plaintiffs had ratified a settlement agreement where the agreement was fully performed and the

plaintiffs accepted its benefits); McLean v. Balkoski, 509 N.Y.S.2d 34 (N.Y. App. Div. 1986) (holding that a party ratified a separation agreement by accepting payments pursuant to it).

## 2.   The Settlement Agreement Between Plaintiff and Defendant

### Sanders is Binding on Plaintiff

The Settlement Agreement in the instant case was intended to "settle in its entirety" the "controversy that had arisen between Plaintiff and Sanders with respect to Sanders' premature release of the escrowed shares." (Movants' Rule 56.1 Stmt. ¶ 18.) Accordingly, the Settlement Agreement provided that "[u]pon receipt of the letter to Interwest and a check [for $2,500] from [Defendant Sanders], H&H will immediately execute and provide [Defendant Sanders] with a general release." (Sanders Aff. Ex. B ("Settlement Agreement") ¶ 4.)

Plaintiff alleges that Defendant Sanders did not comply with his obligations under the Settlement Agreement, and thus that it is "void and ineffective." (Compl. ¶ 170.) Specifically, Plaintiff claims that "Sanders never sent the letter [requesting a stop order on the prematurely-released shares] to Interwest." (Id. ¶ 168.) Plaintiff further alleges that "defendant Sanders prepared this letter addressed (but not sent) to [Interwest] for the sole purpose of fraudulently attempting to convince H&H that Sanders had in fact complied with H&H's request, pursuant to the Settlement Agreement, to

15

inform Interwest regarding the history of the FNTN stock that belonged to H&H." (Id. ¶ 169.)

Defendants have responded to these claims, introducing a sworn statement indicating that Defendant Sanders fully complied with his obligations under the Settlement Agreement. (See generally Sanders Aff. ¶¶ 25-32.) Defendant Sanders states: "I paid the $2,500 [owed to Plaintiff under the Settlement Agreement]. Plaintiff accepted this money. I sent the letter to Interwest [requesting a stop order] on or about October 7, 1997 and Plaintiff has no basis to refute this fact." (Id. ¶ 25.)[5] Defendants assert that "[a]t no time has Plaintiff ever tendered back any portion of the $2,500 and has retained this sum to date." (Movants' Rule 56.1 Stmt. ¶ 22.) Defendants admit that "[a]t no time has Plaintiff ever provided any of the Sanders Defendants with a general release." (Id. ¶ 24.) However, Defendants argue that "Plaintiff's obligation to release Sanders from all adverse claims up to [the time of Plaintiff's acceptance of the benefit of the bargain] immediately ripened whether Plaintiff provided a formal general release or not." (Defs. Mot. Summ. J. 30.)

---

[5]      In their Motion, Defendants further state that "contrary to Plaintiff's assertion that Sanders wrote, but never sent his October 7, 1997 letter to Interwest, Interwest produced this letter during discovery confirming the fact that Sanders sent it to them." (Defs. Mot. Summ. J. 29-30.)

The Court finds Defendants' statements credible, and Plaintiff has not refuted Defendants' evidence that Defendant Sanders complied with his obligations under the Settlement Agreement. If Plaintiff believed that Defendant Sanders did not properly instruct Interwest to place a stop order on the prematurely released shares, he should have either rejected Defendant Sanders' payment of $2,500 or explicitly reserved the right to pursue legal action against Defendant Sanders on claims stemming from Defendant Sanders' breach of the Escrow Agreement. Instead, because Plaintiff accepted Defendant Sanders' payment under the Settlement Agreement without reservation, Plaintiff is now estopped from alleging that Defendant Sanders did not comply with the terms of the Settlement Agreement. See, e.g., Pollitz, 100 N.E. at 725 (finding that ratification of a contract may be "implied through . . . acquiescence, instead of expressed by positive and distinct action or language").

Because Plaintiff is deemed to have ratified the Settlement Agreement and thus to have released Defendant Sanders from liability stemming from Defendant Sanders' breach of the Escrow Agreement, all claims against Defendants relating to this breach—the entirety of counts 3, 4, 5, 7, and 8, and part of count 6[6]—must be DISMISSED.

---

[6]     In Count 6, Plaintiff alleges that Defendant Sanders was negligent and breached his fiduciary duty in (1) breaching the Escrow Agreement by prematurely releasing shares to Holdings and lifting the "stop order"

II. Defendant Sanders is not a Control Person of Holdings and thus is not Liable For Holdings' Alleged Violations of the 1934

Act

"In order to establish a prima facie case of liability under Section 20(a) [of the 1934 Act], a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quoting SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)).

A plaintiff may establish that a defendant had control over a primary violator "by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" First Jersey, 101 F.3d at 1472-73 (quoting 17 C.F.R. § 240.12b-2). "To be liable as a control person, the defendant must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person." In re Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005)

on shares registered in Holdings' name and (2) refusing to issue an opinion letter on the dispute between Stein and Plaintiff. The first part of this claim is dismissed here, as are all other allegations stemming from Defendant Sanders' breach of the Escrow Agreement. Allegations relating to Defendant Sanders' refusal to render an opinion letter are discussed infra, in Part III.

18

(internal quotation omitted).[7]  Indeed, "the Section 20(a)
defendant must not only have actual control over the primary
violator, but have actual control over the transaction in
question."  In re Alstom SA, 406 F. Supp. 2d 433, 487 (S.D.N.Y.
2005).  Thus, "exercise of influence, without power to direct or
cause the direction of management and policies through ownership
of voting securities, by contract, or in any other direct way,
is not sufficient to establish control for purposes of Section
20(a)."  Id. at 486.

In the instant case, Plaintiff claims that Holdings
violated Section 10(b) of the 1934 Act, 15 U.S.C. § 78j.
(Compl. ¶ 203.)  Plaintiff further claims that "Defendant
Sanders, as escrow agent with respect to the transaction for
purchasing the shares of FNTN stock and the retention of those
shares, is . . . a 'controlling person' of Holdings within the
meaning of [the Act]."  (Id. ¶ 207.)  Putting these pieces
together, Plaintiff alleges that Defendant Sanders is "jointly
and severally liable" as a control person "for Holdings'
violations of [the Act] in connection with the purchase of
shares of FNTN stock from plaintiff."  (Id. ¶ 208.)

---

[7]     Global Crossing analyzes control person liability under Section 15 of
the Securities Act.  However, the control person provisions of Section
15 of the Securities Act and Section 20(a) of the Exchange Act "are
essentially parallel" and "are interpreted in the same manner."  In re
Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910, 2005 WL 1881514, at
*11 (S.D.N.Y. Aug. 5, 2005).

19

Defendant Sanders has responded to these allegations, arguing that Plaintiff has not even established a prima facie case of control person liability under the 1934 Act. (See Defs. Mot. Summ. J. 8.) Defendants contend that "Sanders' role was merely that of an escrow agent between Plaintiff and Holdings as it related to Holdings' purchase of FNTN stock from Plaintiff. In fact, it appears . . . that if anything, Holdings had the power to direct and control the actions of Sanders, the escrow agent, not the other way around." (Id. 9.) In support of this argument, Defendants have introduced a sworn statement in which Defendant Sanders asserts that he "was never an officer, director or shareholder of Holdings" and never "possess[ed] the authority or power to direct and/or control this entity." (Sanders Aff. ¶ 36.)

The Court finds Defendant Sanders' statement credible, and Plaintiff has not refuted Defendants' evidence that Defendant Sanders was not a control person of Holdings. Plaintiff does not show that Defendant Sanders had actual control over Holdings in connection with the transaction in question, nor that Defendant Sanders had any power to direct the actions of Stein or any other buyer or seller of FNTN stock. Plaintiff's bare assertion that Defendant Sanders was an escrow agent for the

transaction in question is entirely insufficient to survive summary judgment on this count.[8]

Because Plaintiff has not shown that Defendant Sanders was a controlling person of Holdings, Plaintiff has not established a prima facie case of control person liability under Section 20(a) of the 1934 Act and allegations under this section are DISMISSED.

## III. Defendant Sanders' Refusal to Render a Legal Opinion on the Dispute Between Plaintiff and Stein Does Not Constitute Negligence or Breach of Fiduciary Duty

Plaintiff states that on January 29, 1998, Plaintiff "requested a legal opinion of Sanders regarding the ownership and negotiability of the one million . . . shares of FNTN stock that were in plaintiff's possession. Plaintiff requested the legal opinion because Interwest stated that it needed such an opinion before the shares could be retitled in plaintiff's name." (Compl. ¶ 247.) Plaintiff further reports that Defendant Sanders responded to Plaintiff and declined to provide the requested letter:

---

[8]     In fact, as Defendants suggest, under normal circumstances "an escrow agent must follow the instructions of the parties," not the other way around. 99 Commercial St., Inc. v. Goldberg, 811 F. Supp. 900, 906 (S.D.N.Y. 1993); cf. Nat'l Union Fire Ins. Co. Pittsburgh, Pa. v. Proskauer Rose Goetz & Mendelsohn, 634 N.Y.S.2d 609, 614 (N.Y. Sup. Ct. 1994) ("The escrow agent's powers are limited by the terms of the escrow agreement.").

21

> After reviewing both [Plaintiff and Stein's] positions
> with regard to the dispute over the shares, I am
> unable to render an opinion on this matter.
>
> After discussions with both Hank Schwartz and Michael
> Sheppard, we have agreed that either you work this out
> between yourselves or submit to binding arbitration."

(Id. ¶ 278.)  Based on Defendant Sanders' refusal to render

the requested legal opinion, Plaintiff alleges that

Defendant Sanders "breached the fiduciary duty owed

Plaintiff," (id. ¶ 253,) "willfully, intentionally, and

negligently failed to perform in accordance with the Escrow

Agreement," (id.) and engaged in negligent conduct, (id. ¶

249.)

Defendants have not briefed this claim, and therefore the

Court finds it inappropriate to grant summary judgment on

allegations stemming from Defendant Sanders' refusal to provide

a legal opinion on the ownership of the disputed FNTN stock.

However, the Court will dismiss this claim under Federal Rule of

Civil Procedure 12(c) for failure to state a claim upon which

relief can be granted.

New York courts have repeatedly noted that "[a]n escrow

agreement is a contract" like any other. Egnotovich v. Katten

Muchin Zavis & Roseman LLP, 856 N.Y.S.2d 497 (N.Y. Sup. Ct.

2008); see also Animalfeeds Int'l, Inc. v. Banco Espirito Santo

e Commercial De Lisboa, 420 N.Y.S.2d 954, 957 (N.Y. Sup. Ct.

1979) ("An escrow agreement, while imposing a fiduciary

22

relationship, . . . is in essence a contractual undertaking."). Given this, it necessarily follows that parties to an escrow agreement "cannot impose upon [the escrow agent] any obligations in addition to its 'limited duties under the express terms of its contract.'" Id. (quoting Timmins v. Tishman Constr. Corp., 777 N.Y.S.2d 458, 463 (N.Y. App. Div. 2004)).

Because an escrow agent's duties and powers are limited by the terms of the escrow agreement, mere deposit of funds into an attorney's escrow account is not sufficient to establish an attorney-client relationship. See Solondz v. Barash, 639 N.Y.S.2d 561, 563-64 (N.Y. App. Div. 1996). In fact, in holding money in escrow, attorneys act as agents and therefore function in an entirely non-legal capacity. See, e.g., Copalcor Mfg. (PTY) Ltd. v. Meteor Indus. Inc., No. 87 Civ. 1612, 1988 WL 52194, at *2 (E.D.N.Y. May 16, 1988) (finding that attorneys acting as escrow agents are functioning outside their professional capacity). "It is true that an attorney-client relationship may arise by words and actions of the parties; however, one party's unilateral beliefs and actions do not confer upon him or her the status of client" or charge an attorney with the duty to provide legal counsel. Solondz, 639 N.Y.S.2d at 564.

In the instant case, Plaintiff characterizes his relationship with Sanders solely as that of a party involved in

a stock transaction with an escrow agent. (See Compl. ¶ 233 ("Sanders was selected to serve as Escrow Agent upon the recommendation of defendants Schwartz and Stein. Plaintiff had not previously met or known Sanders.").) The Escrow Agreement itself provides that: "This Escrow Agreement sets forth exclusively your duties as Escrow Agent with respect to any and all matter pertinent hereto and you, acting as Escrow Agent, shall not be subject to any implied duties or obligations."[9] (Sanders Aff. Ex. A ("Escrow Agreement") ¶ 17.)

---

[9] Plaintiff does not include the Escrow Agreement as an exhibit to the Complaint. However, as the Second Circuit has noted, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991). "Clearly, not every document referred to in a complaint may be considered incorporated by reference and thus introduced by the moving party in support of a motion to dismiss." Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 156-67 (2d Cir. 2006) (internal quotation omitted). Rather, "a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." Chambers v. Time Warner, 282 F.3d 147, 153 (2d Cir. 2002); see also Cortec, 949 F.2d at 48 ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

In the instant case, Plaintiff relies heavily on the Escrow Agreement in the Complaint, and paragraphs 86 through 95 of the Complaint analyze the provisions of the Escrow Agreement in line-by-line detail. (See Compl. ¶¶ 86-95.) Therefore, the Court deems the Escrow Agreement incorporated by reference, and considers it in evaluating this claim. See generally Global Network Commc'ns, 458 F.3d at 157 (noting that in most instances in which documents are deemed incorporated by reference, "the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint").

Plaintiff alleges that Defendant Sanders acted negligently and breached his fiduciary duty in refusing to render a legal opinion as to the ownership of the disputed FNTN shares. (See Compl. ¶ 249.) However, Defendant Sanders' duties to Plaintiff were contractually based, and thus limited by the terms of the Escrow Agreement. Nothing in the Escrow Agreement suggests that Defendant Sanders, by agreeing to act as escrow agent for the transaction between Plaintiff and Stein, also volunteered to provide legal counsel on disputes arising from the transaction. See, e.g., Cont'l Ins. Co. v. 115-123 W. 29th St. Owners Corp., 713 N.Y.S.2d 38, 39 (N.Y. App. Div. 2000) ("It is well settled that when the terms of an agreement are clear and unambiguous, the court will not look beyond the four corners of the agreement and will enforce the writing according to its terms."). Plaintiff cannot unilaterally enlarge Defendant Sanders' duties under the contract and then claim that Defendant Sanders was negligent in failing to take these duties on.

Because Defendant Sanders' duties to Plaintiff were limited to those provided for in the Escrow Agreement, Defendant Sanders had no obligation to provide an opinion letter regarding the dispute between Plaintiff and Stein and all allegations stemming from his refusal to do so are DISMISSED.

IV. Allegations Against Defendants Law Office and BMS

Plaintiff states that "Sanders was a named partner of Sanders, P.C. during some, if not all, of the time during which Sanders was engaged in wrongful conduct." (Compl. ¶ 216.) Plaintiff also asserts that "Sanders was a named partner of BMS during some, if not all, of the time during which Sanders was engaged in wrongful conduct." (Id.) Given these affiliations, Plaintiff alleges that "Sanders, P.C. and BMS are also jointly and severally liable" for any behavior for which Defendant Sanders is found liable. (Id.)

Plaintiff alleges that Defendant BMS acted as counsel to FNTN. (Compl. ¶¶ 256-57.) Based on this claim, Plaintiff alleges that Defendant BMS is liable for FNTN's alleged failure to compensate Plaintiff for Stein's wrongful conduct. (Id. ¶¶ 259-60.) Plaintiff further alleges that "BMS is also liable to the extent any other attorney with that firm acted negligently with respect to the matters alleged in this complaint." (Id. ¶ 261.)

Defendants, in turn, have introduced a sworn statement in which Defendant Sanders asserts that "[t]here are no other persons at [Defendants Law Office and BMS] that have any personal knowledge regarding the facts and circumstances of this matter and the transactions surrounding same." (Sanders Aff. ¶ 4.) Defendant Sanders further states that "BMS did not exist

26

during the relevant period of [Defendant Sanders'] alleged
wrongful conduct."  (Id. ¶ 58.)

The Court credits Defendants' uncontested statement, and
finds that Plaintiff's allegations against Defendants Law Office
and BMS are entirely derivative of Plaintiff's allegations
against Defendant Sanders.  The Court therefore concludes that
Defendants Law Office and BMS have no liability under the
Complaint, as the Court has already dismissed all allegations
against the allegedly primary wrongdoer, Defendant Sanders.

Because the Court dismisses all allegations against
Defendant Sanders, all allegations against Defendants Law Office
and BMS must also be DISMISSED.

## CONCLUSION

For the reasons set forth above, Defendants' Motion is
GRANTED in its entirety.


**SO ORDERED:**

BARBARA S. JONES
**UNITED STATES DISTRICT JUDGE**

Dated:    New York, New York
          October 29, 2009

27